Good morning. May it please the Court. I'm Bill Hohengarten, Special Counsel to the Trustee of Magna Com's Bankruptcy Estate. I'd like to reserve four minutes for rebuttal. In this case, the FCC deliberately sought out the benefits of secured creditor status. But with those benefits come obligations, and those obligations include complying with the debtor's unwaivable right to surplus proceeds from any disposition of the collateral after default. Now, the FCC asserts that that rule does not apply here because, as it says on page 20 of its brief, and there's similar statements throughout its brief, cancellation is distinct from foreclosure or other enforcement of the security interest. So it draws a dichotomy between regulatory cancellation of licenses and enforcement of the security interest. The problem is with the FCC's position is it directly is contradicted by the FCC's own security agreement and by the D.C. Circuit's decision in the next wave of litigation, both of which show that the D.C. The FCC is simultaneously wearing two hats here when it regulatorily cancels the licenses. It's also enforcing its security agreement. And I'd like to start by looking at the security agreement itself because I think it's extremely important on this issue. It's on excerpts of record. Page 23 lays out the FCC's remedies under the security agreement in an event of default under the note in security agreement. So this says, what can the FCC do to enforce the security agreement? In 8a, under remedies, the very first remedy of the FCC in the event of default under the security agreement is, quote, the license shall be automatically canceled pursuant to 47 CFR section 1.2110. That's the automatic cancellation regulation that the FCC applied in this particular case. So that regulation, which provides for automatic cancellation, is simultaneously a remedy under the security agreement. Even if the cancellation were an act of lien enforcement, which the D.C. Circuit held, and we may or may not agree with that, just because it's lien enforcement doesn't mean that the property, the collateral, isn't extinguished. That's correct. But the FCC can't extinguish the collateral, and then that's it. There are no proceeds from that because it's gone, and all the FCC has is an unsecured claim against the debtor. Well, that's right. And I think there's two separate arguments the FCC makes, and I think they are distinct. One is that it was not, because it was acting in a regulatory capacity, it could not have been proceeding under the security agreement and enforcing it. That's what I was just addressing. There is a second argument, which is distinct, which is that regardless and this is the point you made, Your Honor, the collateral no longer existed after the cancellation. Now, it's important to, if I could just step back and give some background on that, it's important to appreciate that that does not depend on the FCC being a government agency. It's a very broad assertion. All of the cases that the FCC cites on that issue, on pages 28 to 29 of its brief, all but one of those cases involved disputes between private parties. Now, none of them are Article 9 cases, and I don't think they're apposite because they don't concern proceeds of disposition of collateral. But what the FCC is making is a sweeping argument about termination of rights that would apply not just to government creditors, but to all creditors. And more so so I just wanted to make But what difference does that make, though? I mean, the security agreement itself, I believe, says that cancellation extinguishes or could extinguish the collateral. Is that right? Well, I want to be a little more precise in Section 8d. It's another one of the remedies under the security agreement. Our contention is this is an unenforceable waiver under the security agreement, but it specifically refers to a few lines down. The FCC what would happen in the event the commission rescinds, cancels, or revokes the license for any default under this agreement. So it's enforcing the agreement, and it says the licensee has no claim to proceeds from a reauction, but you can't put in a security agreement the definition. You can't get somebody to waive their right to proceeds by just defining what would be proceeds under the UCC as not being proceeds. I mean, that provision doesn't say, for instance, that it's not an action under the security agreement or something like that. This Court held in – has held in several cases, including the Great Southwest case, which we cite, 860F2nd at 903, that a security agreement itself is not Federal law and cannot override the UCC Article 9 nonwaiver provisions that are incorporated into Federal law as Federal common law when a Federal agency is a creditor. So I don't think the security agreement can resolve the issue of whether these are proceeds, because it's an unwaivable right to proceeds. I wasn't addressing the proceeds. I was saying if it's canceled and the security agreement says that if a default shall occur, one of the remedies is, you know, cancellation of the license. It will be automatically canceled, which extinguishes that license as property. That's – that was signed by the – your client, or the debtor, I guess. In the security agreement. I guess I don't believe that the security agreement says that it extinguishes it as property. What it says is the debtor shall have no claim to the proceeds of a reauction. But that would just be a waiver of the right to surplus proceeds. I mean, the – What does the cancellation do, though? Isn't that a regulatory? Well, it's a – it's a – it's a regulatory action that's enforcing the security agreement, and it does end the licensee's right to use the Spectrum, just as any other enforcement of a security interest ends the debtor's right to use the particular property at issue, I mean, repossession of a car. But the property is the license, not the Spectrum, correct? The property that was in the estate was the license. The Spectrum was never part of the estate. That's correct. And so by canceling the license, you've extinguished the property. I'm having trouble understanding how. Well, I don't think – I guess I – so to jump forward, sorry about that. The issue of whether there's proceeds does not depend on whether the original collateral continues to exist. Proceeds turns on traceability or substitution. That's the standard. And there are many cases which we cite which hold that even after the original collateral is destroyed or terminated, proceeds can still come about. And the two cases that are most on point are the SRJ and Metro Motors cases from bankruptcy courts, both of which concern the proceeds of terminated exclusive franchises. In those cases, the franchises were terminated in order that new franchises could be issued to somebody else, and a payment was made in connection with that. And the courts in those cases held that the proceeds were the – that the proceeds of the terminated franchises, because they could be traced back to them, and that you could have disposition of collateral by termination. There's other cases that involve impairment or destruction of collateral where there's insurance is proceeds. And in this Court's own decision in the MLQ case, which was the case that held that private lenders could take security interests in the proceeds of collateral, the Court actually very carefully went through and analyzed what the nature of that security interest is, and it was an interest in the inchoate right to proceeds that attached even before there were proceeds. And that's what I would suggest that the debtors still had here, even though the license was canceled. Let me ask you a factual question. After the cancellation of the license, when the FCC put in a creditor's claim, they put it in as an unsecured claim? As they said in the brief, it was an unsecured deficiency claim. Right. So they weren't claiming a priority over other debtor – other creditors because of the fact that they had been a secured creditor. They're not proceeding further as a secured creditor. Well, I have two steps to that argument. First of all, a deficiency claim is inherently what a secured creditor puts in. It's the difference between the amount realized on collateral. Yeah. And the – I don't need to be – And it's an unsecured claim. And the – at that point, the FCC had canceled the licenses but not resold them yet. Right. And so it was asserting, as it said, a deficiency. That's not even quite right. I think that before they put in their claim, they had, in fact, had the options set up. No, that's not correct, Your Honor. And I'm sorry I don't have an exact citation right now, but perhaps at rebuttal I can direct your attention to one. But they put in the claim, they sold the license – the new licenses at some point – Well, they had a – there was a debt. I mean, there was an installment sale for the license. And they had $48 million still outstanding. They canceled the license, and they said, you still owe us $48 million. That's right. And that was originally allowed. It was – And then subsequently disallowed. And it was disallowed because the court later found that the – the bankruptcy court found that the proceeds from the reauction satisfied that debt. I mean, we believe – Well, they said they were basing it on the FCC's policy of not pursuing additional funds once they've been made full. So it didn't make a finding that this was – All right. – anything related to the collateral, necessarily. I respectfully disagree and would like to go through that in some detail. I just would like to very quickly finish on one point with – from Judge Fletcher's question, which is about whether the FCC was proceeding as a secured creditor, even if it put in the deficiency claim after cancellation purely as an unsecured creditor, although I'd say a deficiency claim is inherently a secured creditor claim. The FCC got substantial advantage as a secured creditor when the automatic stay was lifted, because the bankruptcy court lifted the stay specifically under those provisions of the Bankruptcy Code that allow an automatic stay to be lifted to allow a secured creditor to foreclose on its collateral. And bankruptcy court refused to rule on the FCC's alternative argument that the automatic stay did not apply at all because of the regulatory exceptions. So the bank – the I mean, in order to foreclose on collateral, it would have had to go through judicial steps, correct? I'm sorry. I used the word foreclosed loosely. It disposed of the collateral. But what the bankruptcy court said on – I just would like to get this right. And I believe it's ER78. It's the transcript of hearing on the – on the lift stay motion. It said specifically, I'm going to lift the stay under sections D-1 and D-2 of Section 362, which are exceptions that allow a secured creditor to proceed against the property, dispose of it when it's not adequately protected or there's no – currently no equity that the debtor has in the property. So it was – and I – and then the Court goes on to say, and I'm not going to rule on the regulatory – the argument that the regulatory exception to the automatic stay applies. So it was not buying the argument of the FCC that they could proceed regardless of whether they were a secured creditor. It said it didn't rule. It isn't the same as not buying it. It just – Well, it said – yes. It believed that the FCC had not actually procedurally raised that in a proper way, so it refused to grant the relief the FCC was asking for in that particular hearing. It – possibly if it had been – you know, it wasn't forced to ultimately rule on that it was or wasn't entitled to it, but what I'm saying is the FCC did get this significant advantage from this Court, which was the lifting of the stay, which allowed it to sell the licenses. Otherwise, the next wave decision in Section 525 would have stopped it from doing that. Now, on the question of what the bankruptcy court ruled in the – in the – on the reconsideration of the FCC's claim to the claim when it disallowed that claim, I think that with – the FCC really materially misstated what occurred in that context. The FCC makes it sound like they forgave the claim and weren't opposed to reconsideration. And the reality is that the FCC very vigorously opposed reconsideration. I mean, they flew lawyers out from Washington, D.C. to attend the hearing and say that the claim shouldn't be reconsidered. And the – I'd like to point to the pages in the – pardon me, getting used to reading glasses here – in the E.R. page. First of all, I'd just like to note on page 86, right before – when the Court's finishing discussing the facts before conclusions of law, the last point he notes is the FCC opposes the motion for reconsideration. It was not forgiving the debt. And then the Court went through in E.R. 88, after addressing whether Rule 60b applies, in saying that, well, they'll stay – the claim should be reconsidered under Rule 60b-5 on the ground that the debt's been satisfied or the judgment's been satisfied. The Court specifically says in that last paragraph, relief is warranted based on the fact that the FCC's claim against the debtor's licenses of $1,000,000 has been satisfied. That means paid off, not forgiven. And the Court goes on to reject the FCC's argument. The FC – the Court is unconvinced by the FCC's argument that the claim may not be reconsidered because the licenses that it subsequently auctioned were different licenses. That's the very argument the FCC is making here. And the Court goes on to list the FCC's arguments, including that the FCC relies on the fact that the debtor's licenses were cancelled, and it lists a few other grounds, and then goes on in the next page to say, rejecting those arguments, no matter how labeled, the FCC could not have auctioned these licenses to new users but for the debtor's default. Now, that is applying the traceability standard that applies under the UCC. And that's the – that's the holding of the Court. It next goes on to discuss this issue of equitable forgiveness that the FCC raised for the first time on the hearing – at the hearing on this motion and then submitted a supplemental brief. But the Court doesn't reach any solid conclusion based on that discussion. If you go down to the bottom of page 89, at the very bottom, the Court concludes its discussion by saying it's unclear whether such a double recovery would ever be requested by the FCC in a non-bankruptcy situation. Accordingly, it can be argued that it is inequitable to only request this double recovery in a bankruptcy context. The Court's kind of making a tentative conclusion based on its comments. Well, where does – where does this all get us? Well, I think that this is about the issue preclusion argument that the – the Court – because we think this is very important with the debate. Let me ask you this. On this, the FCC, your client got a license from the FCC. Right. All right. Did your client obtain ownership of this so-called spectrum? No, not of the spectrum. It had a proprietary interest in the license itself. In the license. All right. Yes. And – and your client didn't make the payments on the license. That's right. It went into bankruptcy. And the FCC had a right, then, to cancel the license. Yes, after getting the automatic state lifted. Well, with the debtor's consent. Yeah, they had a right to get it canceled. So once a license is canceled, your client's got nothing. I don't agree. Under UCC Article 9, it still has this inchoate interest in the proceeds when they – when, in fact, they come about. And that's what this – I believe – Well, then – then the FCC turns around, and economic conditions have changed. There's a big market for this. And they sell it for, what, $289 or $98 million. And so you're saying that – that after you deduct the $49 million to your client owner, you got to – you should have that money. That's right. The same rule that would apply if they'd repossessed a car or a more analogous commercial case would be where there's a tangible collateral that fluctuates in value. But, you know, you bought the car, and you're paying it on the installment plan. You didn't buy anything here. Well, I do – I do disagree. You just bought the privilege of using this band so long as you made these payments. Well, it's also true with the car. You have the privilege of using the car so long as you made the payments. I mean, it's recognized that there is a proprietary interest that the debtor has in these licenses, even if it's not property in the fullest sense. And I do think the – You build up – you build up equity in the car. You don't build up equity in the – in the – in the spectrum. In this case, the car was totaled, so. But, Your Honor, and that's a perfect example, because in a case where a car is totaled, then if insurance proceeds get paid, that's proceeds. And to go back to the issue of the breadth of the – But if the dealer sells a different car, you're not entitled to that. I mean, here it's selling a different car. Because it's not traceable. It's the traceability standard. The rights are exclusive. And so is the – what the – what the bankruptcy court properly said in his – his order disallowing the FCC's claim is that the new licenses, which were for the – for the same spectrum, same exclusive spectrum, were traceable to. And therefore, the proceeds of the resale have to be used to pay off the license debt. Counsel, let me ask what authority you have for the proposition that the provision in the agreement that there would be no right in any future proceeds cannot be enforced. Well, so first of all, UCC Article 9 section, we cited it in our brief, and I can cite the exact section which says this is an unwaivable right. So the UCC makes it unwaivable, and under Kimball Foods, that's Federal common law. Your Honor, I think your opinion, actually, in the Great Southwest case is on point on this issue, because it says that the waiver in the security agreement is not Federal law. That was an SBA case. And the SBA pointed the number of waivers in the security agreement of rights under Article 9, and the Court said that's not Federal law that can override the UCC incorporated into Federal law. And the Court in that case cited an earlier Ninth Circuit case that held also exactly the same thing. So I think it's directly on point authority on that, that the waiver is unenforceable. Let me answer this. So here was your client. You had this Spectrum that was licensed to you, and you owed a bunch of money to the FCC. Could your client, then, have sold that privilege in the Spectrum to a third party? If the licenses hadn't canceled, they are regularly sold between parties. In fact, the – I mean, that's the reason why this Court recognized in MLQ that there's a proprietary interest in licenses, is that they do need – the sale needs to be approved, but it is approved by the FCC if the new licensee, the transferee, is an appropriate transferee. And, in fact, the FCC has recently adopted new regulations to make that even easier, because the whole point is there's a market in licenses out there for spying and selling among licensees. But your client acceded to having their licenses canceled, so we've got no further interest here. It agreed to the cancellation, but specifically at the Lyft State hearing, its position was that it could be – they could be canceled because it was – the FCC could enforce its note and security agreement. And that's no different than any – the guy who's done it is left agreeing that the car could be repossessed because he can't – the security agreement can be enforced. If the – if they don't realize that if it's going to be repossessed That guy whose car is being repossessed, before they pull it out of his driveway in the early morning hours, he could find another buyer for it. He could sell the car, subject to that – and then the – subject to the installment that was owed, and that new buyer could just pay off what was owed, and that would be it. That could happen. But you couldn't do that here. Well, we couldn't do it at the point because of the fluctuation in the market. The licenses at that point didn't have enough value. But that's something that happens with other types of tangible property, no government interest. You know, a commodity that goes up and down a security agreement in 10 tons of coffee, market falls. I know, but here's the thing. But here, it's the – what you have is government property, and you just have the privilege of using it. Well, but it's a privilege. You can't pay a fee for it. It's a privilege that can be transferred, and in fact the – Well, that's if the government lets you transfer it. But that's always been recognized. That's why it's recognized to be property of the estate, is it's regularly the case that debtors in bankruptcy cases do transfer the licenses. Next Wave, for instance, was in a similar condition as Magna Com, didn't have equity in the licenses, but was able to fought to keep the licenses. When the value went back up, it transferred those licenses with the FCC's approval for sums well above what it owed the FCC, paid off the FCC, and kept the profit. If it had been financed by a bank rather than the FCC, if the bank had – if the licenses had then been forced to be transferred and money had come in, the bank would have only gotten paid off the amount that it was owed, not the surplus would have gone to the debtor. That's what happens all the time in these transactions. And all we're saying is the FCC only had an interest in getting the $48 million back, and after that, the surplus did belong to the debtor. If I may, just before I sit down with this – You've used up your time, please. Yeah, your way of, you know, you've got to get going here. Well, you're the first man I've seen with a bowtie in a long time. Is that right, Your Honor? Yeah. You must be a professor. Not at all. Judge Fletcher, it's good to see you again. May it please the Court, I'm Thomas Byron from the Department of Justice, and I represent the FCC in this matter. I'd like to start by emphasizing, as Judge Fregerson, your questions noted, that the Communications Act in 47 U.S.C. 301 specifically states that a licensee has no property or other interest in the underlying spectrum. And what the plaintiff in this case with the debtor in this case is trying to achieve is a way around that restriction by essentially saying no good deed goes unpunished. The FCC here, in formulating the structure of the competitive bidding process, the auctions that Congress authorized in Section 309J, decided to give special advantages to what were called designated entities, in this case, small businesses. One of the most significant advantages that it gave those designated entities was the right to pay over time in installments. Every other licensee in broadcast, in wireless, in every circumstance, satellite, must pay cash on the barrel head 100 percent before getting the licenses issued from the FCC. Now, if those licenses are later canceled, whether automatically or otherwise and, bear in mind, there are automatic cancellation provisions, always have been since long before the auction process was authorized by Congress, there is no right to any refund of the bid that was paid before the license was issued. That's clear. No one disputes it. So what the plaintiff here is saying is that the FCC suffers a disadvantage, enormous disadvantage, suffered by the citizens and taxpayers of the United States since they seek to recover from the Treasury, by giving benefits to small businesses and designated entities. Now, that has no roots in equity. Equity is the source of the bankruptcy court's authority here. Equity is what the FCC exercised in its Kennedy letter in explaining that there was no right to recover what these plaintiffs and others at the time were calling proceeds of a reauction. And let me turn to why that's right. The main reason it's right is because this is not a reauction. As Judge Pregerson and Judge Akuta, I think, your questions reflected, these were quite different licenses that were auctioned in what's called Auction 35 a couple of years later. They were different in a number of key ways. As the bankruptcy court itself noted, they were different first because they encompassed different time periods. They had a new build-out date, which was substantially later. And after all, there was no effort to build out a wireless telecommunications system by Magna Com. They were different as well because there the rules for designated entities, the rules for financing by other than small businesses, were changed significantly, allowing the participation of companies that could not have participated in the auctions that this company bid on the licenses. Those changes, as well as the fluctuations in the market that you noted, Judge Pregerson, made a substantial difference in the price for those – in the winning bids, I should say, for those later licenses that were new licenses. After all, the FCC only has the authority to auction under 309J initial licenses. It cannot use its 309J competitive bidding authority to take something that was previously issued, a license previously issued, and seek to resell it, which is what their theory is. It doesn't have that authority, and it didn't exercise it. Their theory exists solely – their theory is one of traceability, they say. That we didn't foreclose. They admit that. They say we somehow otherwise disposed of what they call collateral. It sure looks like that. You've got a license. You've taken a security interest in it. And then you sell something that looks very much like the collateral with some changes. You say you've extinguished it. And now you're selling essentially the same collateral. And the question that came to my mind is, why does the FCC have a security agreement and a security interest in collateral that they're going to extinguish and then sell something else, some other property? Can you explain that? Yes, Judge. The reason is, as also explained in the security agreement, I think we quoted it. I can find it if you'd like. The principal reason for the FCC to get a security agreement and this note, to secure its interest in the note, is to ensure that the FCC has priority over any other lenders. Now, opposing counsel explained to you that there is a commercial market for the resale of licenses, subject, of course, to regulatory approval by the FCC. Now, that means, of course, as this Court recognized in MLQ, that there's also a commercial market for lending subject to collateral on what this Court recognized could only be the proceeds of the licenses, not the licenses themselves. The FCC, at the time it drafted these security agreements, which was before MLQ was issued, was faced with some uncertainty because there had been differing opinions in the courts about the scope of the kind of collateral that could be achieved in a security agreement on a license by a private party. So the FCC made clear that it would have priority over any other secured lender in the event of a sale, principally. Now, that was the reason for doing it. Opposing counsel now tries to make a great deal more of it than that, saying, principally, that the FCC asserted something more than priority. Well, of course they did. At the time, before MLQ, it was quite uncertain whether a lien on a license itself would be allowed by a court. And if so, the FCC wanted to be sure that it had priority over those kinds of liens. Quite reasonably. Well, I would have to worry about that, because it had priority over the other liens on the license. Right. Because you couldn't foreclose on the lien, could you, unless you got the FCC's approval. No one really was contemplating foreclosing on a lien, Judge Ferguson. So what's the point of someone having a security interest in a license? Well, as this Court explained in MLQ, there is no point. And really, such a security agreement exists only as to the proceeds, not the license itself. Let me back up for a moment, because I think it answers another of your questions, Judge Acuda, and talk about what a license means. A license, as I think some of the Court's questions earlier reflected, is a right to use the underlying spectrum. That right is subject to terms and conditions. Some set forth in the body of the license, but remember, the body of the license also incorporates the Communications Act and the provisions of the regulations, 47 CFR, governing that license. So a license isn't a thing like a car. A license is more like a lease, a right to use underlying property. Now, that underlying property, of course, is something that a licensee has no property or other right or interest in. That being the case, the only link that Plaintiff here asserts as to traceability is in that underlying spectrum. Remember these differences I pointed out in the licenses. The only thing they have in common, the thing that the Plaintiffs here keep coming back to, is they say an exclusive right to use the same spectrum. But remember, that spectrum is the one thing that the Communications Act makes clear they have no interest in, no property rights over. Now, bear in mind the difference, though. The FCC does have the exclusive right on behalf of the United States and its citizens to control and own and regulate that spectrum. Thus, in the Kennedy letter, when the FCC in the exercise of its equity and policy authority said that they would not seek double recovery because it wouldn't be equitable, the FCC was looking to that similarity of the spectrum. But that was permissible because the FCC, on behalf of the government, owns that spectrum and can make that link. These private parties cannot. They do not own that spectrum. They are not authorized to try to make the link to new licenses for purposes of establishing a surplus of proceeds. That's the key difference here. And it goes to the fundamental flaw in the traceability argument that the plaintiffs have offered here. And I think that the bankruptcy court's decision disallowing the FCC's unsecured claim makes that clear. The court there said, I'm not going to decide a lot of these extraneous issues. I'm not going to decide, for example, the issue they raise now about whether they're going to get any surplus proceeds. It says, instead, I'm going to recognize what the FCC has said, which is that for the purposes of the FCC's exercise of its equitable policy discretionary authority, the FCC will not seek double recovery. For that reason, I'm disallowing the FCC's claim on the terms the FCC itself explained to me. Now, that in no way precludes the bankruptcy court, as it later did, from saying there are no surplus proceeds because there is no collateral being resold. And the bankruptcy court, of course, is the best judge of its own prior decisions. It explains what it did because it knows what it did. The effort now to parse the language of that decision and make of it something the bankruptcy court said it was not should not be countenanced. Let me turn for a moment to equity as well, because the FCC's exercise of its equitable authority in essentially forgiving this debt or recognizing that it wouldn't seek double recovery from this debtor is one thing in equity. And the bankruptcy court's recognition of that is another. But remember, too, a license, this bundle of rights, to use the underlying spectrum, is allocated by the FCC in the public interest. That's what the Communications Act says. And it's done so under The Congress and the FCC have decided that the best way of judging the public interest is to use market forces, competitive bidding, to determine the highest and best use of this valuable public property, the spectrum. In doing so, though, the FCC does, in an auction, what it has always done, either in lotteries or comparative hearings or however. It seeks to ensure that the public's spectrum will be used in the public interest. Now, when this company, MagnaCom, was a company that was the winning bidder for these licenses, it promised to use the spectrum in the public interest. And it never accomplished that. It never made any effort to build out a wireless telecommunication system. It never offered service to the public. And yet, they appear today in an effort to twist the UCC and to punish the FCC for its good deeds here. And that is not equitable. That is not something that this Court, in the exercise of its appellate authority over the bankruptcy courts, should countenance. Ginsburg. Counsel, can you explain the D.C. Circuit's opinion in the next wave? How does that affect our analysis here? It doesn't, Judge Akuta, for a couple of reasons. First, the D.C. Circuit's opinion is not the governing law. The Supreme Court's opinion on certiorari from that is. The plaintiff here tries to make a great deal of one alternative holding of the D.C. Circuit, which the Supreme Court did not reach. And that is the applicability of Section 362a, 4, and 5, which govern lien enforcement under the automatic stay. The D.C. Circuit said the Second Circuit didn't really reach that. Well, that's not true, first of all. The Second Circuit did, because the Second Circuit recognized the difference between regulatory cancellation on the one hand and commercial creditor status on the other. That's all water under the bridge. It doesn't matter, because the thing that matters is that the Supreme Court didn't reach that question. So when the D.C. Circuit said, as an alternative reason for concluding that 525 applied, they said, well, 362a, 4, and 5 also apply. So we think that the FCC's argument, which sought to link the regulatory police exception under 362b to 525, they said, first, we don't think that link works. Second, even if it did, we think 362a, 4, and 5 apply. All of that, of course, wasn't necessary to the Supreme Court's disposition of the case, and thus is not controlling. Let me turn for a moment, though, to why that wouldn't matter here at all. And that is that with the consent of the debtor itself, the Bankruptcy Court lifted 362's automatic stay provisions here, to the extent necessary. Now, I think in his opening argument, opposing counsel has misstated the holding of that lift-stay order. The Bankruptcy Court, in the lift-stay order, simply said that it was lifting the automatic stay to the extent necessary, and in the later opinions, in the later opinions, explained that it did not reach the question, first, whether cancellation had already taken place, second, whether cancellation was otherwise authorized outside the bankruptcy context, in other words, under the Communications Act, or, third, whether any affirmative act would be required. Right? Those are all questions not reached and thus not disposed of in that first opinion. Now, they were explained by the Bankruptcy Court in its later opinions, and those were correct and should be upheld. The last point I'd like to make is that nothing in NextWave, nothing in the Security Agreement precludes the FCC's role as a regulator. That's its historic role under the Communications Act, after all. And that's what the Bankruptcy Court and the district court in this case recognized was the source of the FCC's authority to promulgate the automatic cancellation rule and to carry through with that automatic cancellation rule. The opposing counsel in his opening argument cites excerpts of Record 23, asserting that because in the Security Agreement it lists one of the things that will happen as a descriptive matter, necessarily that transforms automatic cancellation from a regulatory matter into a financial or commercial one. Not so. By describing the operation of the automatic cancellation rule in the event of nonpayment, the Security Agreement has not affected the FCC's regulatory authority, nor could it. The FCC would have to have intended something much more substantial in a private contract that could not accomplish what opposing counsel now says it had the effect of, which would be to alter existing regulations. And that's not what it did. I will point out as well that when opposing counsel in his opening argument quoted from ER23 in subparagraph D, he omitted the key part of that sentence, which says about rescission, in the event the commission rescinds, cancels, or revokes the license for any default under this agreement, he stopped there, or any other violation of the terms and conditions of the license. That's the key language, after all. That was the basis for the FCC's regulatory role and the basis for the automatic cancellation. I think you've covered it all. Yes, Your Honor. If the Court has no further questions, we'd urge you to affirm the judgment below. Thank you. All right. Thank you. May I have a few minutes for rebuttal, please? I asked him to — he's through, so he left you three minutes. Thank you, Your Honor. Very generous. Just a couple points. First of all, as counsel for the FCC emphasized right at the beginning, the FCC took a security interest here for financial advantage to make sure that it primed other creditors. And our point is just when you take on the rights of a secured creditor, you are subject to the obligations under Kimball Foods and Article 9. And one of those obligations is the paying the surplus proceeds over. If you're concerned about equity, I believe that the rule that's been adopted by all 50 States and uniformly by courts throughout the history of secured transactions shows what's equitable here, which is that once the FCC was paid in full the $48 million, it has no further interest in this money. It should go back to the debtor. It's not a punishment to the FCC because it never had a claim to more than the $48 million. If Magna Com had been able to pay the $48 million, there hadn't been a brief market downturn. It could have transferred the licenses later and never been — and no more money would have ever gone to the FCC. It's not a — so that's the first point I'd like to make. The second point is that counsel said a couple times that Magna Com never made any effort to — to build out its network or to offer service to the public, and that's a — a misstatement that has no support in the record. That's kind of irrelevant, however. Okay. I just want to make sure that it's clear that the reason they canceled the licenses was for nonpayment and there's no further — That's very — that's very clear. Okay. And then the point — the last point is that the — the FCC wanted to forgive the debt, it says, before — for the — for the reconsideration of its claim. It came in offering to forgive the debt. What the FCC actually said, and if the Court has any doubt about this, I urge you to read the supplemental brief that's submitted in Magna Com's main bankruptcy case. What the FCC actually said is forgiveness is discretionary, and we will only exercise that discretion here in exchange for Magna Com waiving all claims against the FCC. Then we will subordinate — not actually forgive, but subordinate our — our claim to other creditors. And that's what the bankruptcy court rejected. It rejected that proposed settlement because the claim had no value, because it had been satisfied by the debt — by the reauction as the proceeds of Magna Com's licenses. And on the narrow issue of the proceeds question, not all issues of our claim, but the narrow issue of the proceeds question, that has issue-preclusive effect, we believe. There's a Venn diagram, and that's the intersecting portion. Are there no further questions? Thank you. Thank you.
judges: B. Fletcher, Pregerson, Ikuta